UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


ALTON HUBBARD,

        Petitioner,

v.                                         Case No. 2:10-cv-38
                                         HON. R. ALLAN EDGAR

GARY CAPELLO,

        Respondent.

_____/


## REPORT AND RECOMMENDATION

        Petitioner Alton Hubbard filed this petition for writ of habeas corpus challenging his

May 9, 2005, convictions of first degree murder, five counts of second degree murder, felon in

possession of a firearm, and felony firearm. Petitioner was sentenced on May 24, 2005, to life

imprisonment. Respondent has filed an answer and has complied with Rule 5 of the Rules

Governing Section 2254 Cases in the United States District Courts. The parties have briefed the

issues and the matter is now ready for decision.

        Petitioner Alton Hubbard and his brother, Idolthus Hubbard, were convicted of

murder after three people were shot and killed inside a drug house located in Detroit, Michigan.

Petitioner and his brother were tried jointly, and both made statements to police. Motions to sever

the trial and motions to suppress were denied. The Michigan Court of Appeals set forth the facts:

> At trial, Alton's jury and Idolthus's jury were selected from two
> separate venires. Opening statements concerning Alton Hubbard were
> given before Alton's jury only. Opening statements concerning
> Idolthus Hubbard were given before Idolthus's jury only. Detroit
> Police Sergeant Ed Williams testified before Idolthus's jury
> concerning the details of Idolthus's statements to the police. In the

first statement, Idolthus blamed Alton for shooting Edmonds and Olson, but did not account for the shooting of Rivers. He stated that Alton had used both a .38-caliber revolver and a 12-gauge shotgun. Idolthus admitted that he was at the scene and that he had possessed a .38-caliber revolver that was similar to the one possessed by Alton. However, Idolthus stated that he killed no one and that he only "shot at the wall." Idolthus stated that the homicides were robbery-related, and that Alton had wanted to rob the house at 4139 Canton Street in order to "get [the] bread." Idolthus suggested that Alton had killed Edmonds and Olson because he did not want to "leave [any] witnesses."

Williams then testified concerning Idolthus's second statement to the police, and read the statement before Idolthus's jury. In the second statement, Idolthus stated that he had not been completely truthful in his first statement. Idolthus stated that although Alton had shot Edmonds and Olson, he had shot the "lady" in "the kitchen."

Idolthus's jury was then excused and Alton's jury was brought into the courtroom. Detroit Police Sergeant Ernest Wilson testified regarding Alton's statement to the police, and read the statement before Alton's jury. In the statement, Alton admitted that he had shot Edmonds and Olson, but stated that Idolthus had shot Rivers. Alton also stated that Jones had been present at the scene, had possessed a gun, and had shot into a front bedroom. However, Alton indicated that Jones had not killed anyone.

Trial then proceeded before both juries. Several police witnesses testified that both codefendants had been advised of their constitutional rights, had voluntarily waived their rights, had indicated that they were willing to speak with the police, and had been treated fairly before giving each statement.

Genevia Pernell testified before both juries that she was a family friend of codefendants and that she knew their mother well. Pernell testified that she could account for Alton's whereabouts for the entire afternoon and evening of August 18, 2004.

Alton then testified before both juries concerning his alibi defense. He testified that he was never present at 4139 Canton Street on August 18, 2004. Alton testified that during his interrogation, he and Williams got into a verbal altercation and that Williams "punched [him] in the chest," punched him "more than five" times, and attempted to choke him. According to Alton, Wilson then wrote out a statement and forced him sign it. Alton testified that he only signed

and initialed the statement because he was afraid of being further physically abused, and that he told Wilson "whatever [Wilson] wanted to hear" because he "didn't want to be hit no more." Alton claimed that he never told the police that he had shot anyone, that he had possessed a firearm, or that he had been present at 4139 Canton Street on August 18, 2004. Alton testified that although he signed the statement and had even written out a portion of it in his own handwriting, Wilson had simply fabricated the content of the document. Although Alton denied ever implicating himself in the homicides, he did admit that he had earlier told the police that "[Idolthus] probably did the murders."

Idolthus then testified before both juries that he had been selling crack at 4139 Canton Street on August 18, 2004. Idolthus testified that he had already left 4139 Canton Street for the day and was walking in the vicinity of Gratiot Avenue and East Grand Boulevard when Alton pulled up in a car and "told [him] to get in the car." According to Idolthus, Alton asked where he could get a gun. Idolthus testified that he had a 9 mm handgun in his possession at the time, but did not want to give it to Alton; therefore he told Alton that he could use a 12-gauge shotgun that was kept in the upstairs bedroom at 4139 Canton Street.

Idolthus returned to 4139 Canton Street with Alton late in the afternoon of August 18, 2004. Alton and Idolthus entered the house and Idolthus went upstairs to get the 12-gauge. Idolthus then returned downstairs and gave the shotgun to Alton. He testified that Alton took the shotgun, racked it, and walked toward the kitchen. Idolthus claimed that he remained in the living room and that he heard Alton shooting in the kitchen. He testified that he turned and saw Alton coming out of the kitchen with the shotgun and a .38-caliber revolver, and that Alton then shot Frank Olson in the dining room. Idolthus testified that he then ran from the house.

Idolthus maintained at trial that he did not shoot anyone and that Alton had killed all three victims. Idolthus testified that, although he possessed a 9 mm handgun at the time, he had never possessed a .38-caliber revolver and had never fired any shots at 4139 Canton Street. He also testified that he never discussed robbing the Canton Street house with Alton. The prosecution made clear that it believed the homicides were in some way related to a robbery or attempted robbery, but Idolthus retorted, "Why would I help rob my own dope house that I make money at?" Idolthus admitted that he signed and initialed both his first and second statements to police. But he claimed

he was forced to sign the second statement only after Williams had wholly fabricated it in order to implicate him in the homicides.

Michigan Court of Appeals' decision at 2-4, docket #33.

Petitioner raises the following claims in his petition:

I. The trial court's refusal to suppress the defendant's confession was clearly erroneous and an abuse of discretion which deprived the petitioner of his constitutional rights under the Fifth and Fourteenth Amendments, where the confession was involuntary and only extracted after a physically abusive custodial interrogation.

II. Petitioner was deprived of his liberty without due process of law, and his constitutional right to a fair trial, where the petitioner was convicted on the basis of a highly suggestive in-court identification.

III. Petitioner was deprived of his liberty without due process of law, and his constitutional rights to a fair trial and the effective assistance of counsel where his court-appointed trial counsel failed to request an in-court lineup pursuant to People v. Maire, and for the appointment of an expert on eyewitness identification.

IV. Petitioner was deprived of his liberty without due process of law, his right to a fair trial, his right to a properly instructed jury, and his right to the presumption of innocence, by the incomplete instruction given by the trial court on reasonable doubt.

V. Petitioner was deprived of his liberty without due process of law. The prosecutor's improper comments on petitioner's failure to testify and bolstering the prosecutor's case denied petitioner a fair trial.

VI. Petitioner was denied due process of law when the trial court refused to sever the trial from his brother co-defendant, who implicated petitioner in the shooting.

VII. Ineffective assistance of trial counsel for failing to investigate the history of the petitioner's jurisdictional defect.

VIII. Ineffective assistance of appellate counsel for failing to raise a dead bang winner on appeal of right.

IX. Petitioner is entitled to relief from judgment because of a jurisdictional defect and structural error because the charging information failed to contain the underlying felony charge violating petitioner's right to due process.

In April of 1996, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) became effective. Because this petition was filed after the effective date of the AEDPA, this Court must follow the standard of review established in that statute. Pursuant to the AEDPA, an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This provision marks a "significant change" and prevents the district court from looking to lower federal court decisions in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). To justify a grant of habeas corpus relief under this provision of the AEDPA, a federal court must find a violation of law "clearly established" by holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Recently, the Supreme Court held that a decision of the state court is "contrary to" such clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* A state court

decision will be deemed an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 412. Rather, the application must also be "unreasonable." *Id.* Further, the habeas court should not transform the inquiry into a subjective one by inquiring whether all reasonable jurists would agree that the application by the state court was unreasonable. *Id.* at 410 (disavowing *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996)). Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 409.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy,* 160 F.3d 1131, 1134 (6th Cir. 1998). The habeas corpus statute has long provided that the factual findings of the state courts, made after a hearing, are entitled to a presumption of correctness. This presumption has always been accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990). Under the AEDPA, a determination of a factual issue made by a state court is presumed to be correct. The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied*, 527 U.S. 1040 (1999).

Petitioner claims that his involuntary confession was improperly admitted into evidence during his trial in violation of the Fifth and Fourteenth Amendments. The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal

case to be a witness against himself." U.S. Const. amend. V.  The Supreme Court has characterized

this right as an "essential mainstay of our adversary system," *Miranda v. Arizona*, 384 U.S. 436, 460

(1966), and inherent in this right is the individual's "right 'to remain silent unless he chooses to

speak in the unfettered exercise of his own  will.'"  *Id.* (quoting *Malloy v. Hogan*, 378 U.S. 1, 8

(1964)).   The Court has further held that inherent in the privilege against self-incrimination is the

right to an attorney.   *Id.* at 444.   A defendant may waive these rights, provided the waiver is made

"voluntarily, knowingly and intelligently."  *Id.*

        In determining whether a waiver of these rights is valid, the Supreme Court has

identified two requirements:  First, the relinquishment of the right must have been voluntary in the

sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or

deception.   Second, the waiver must have been made with a full awareness of both the nature of the

right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of

the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite

level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran v. Burbine,* 475 U.S. 412, 421 (1986).

        The ultimate issue of the voluntariness of a confession is a legal question requiring

independent federal determination.  *See Arizona v. Fulminante*, 499 U.S. 279, 286-287 (1991);

*Miller v. Fenton*, 474 U.S. 104, 112 (1985).  However, the subsidiary factual issues are entitled to

the § 2254(d) presumption.  *Id.*  Accordingly, the trial court's findings of fact are governed by the

presumption of § 2254 where fairly supported by the record.  *See e.g. Sumner v. Mata*, 455 U.S. 591

(1982); *Strickland v. Washington*, 466 U.S. 668 (1984).  Based upon these facts, the court must make

an independent determination whether the findings "add up" to coercion.  *Miller*, 474 U.S. at 112;

*see also Cooper v. Scroggy*, 845 F.2d 1385, 1390 (6th Cir. 1988).

The Michigan Court of Appeals rejected this claim, explaining:

Alton argues that he was coerced into giving and signing his confession through abusive police conduct, and that the trial court therefore erred in ruling that the confession was voluntarily given We disagree. When reviewing a trial court's determination of the voluntariness of a statement, this Court must examine the entire record and make an independent determination, but we will not disturb the trial court's factual findings absent clear error.

A custodial statement is admissible only if the defendant voluntarily waived his Fifth Amendment rights. The prosecution has the burden of establishing a valid waiver by a preponderance of the evidence. The voluntariness of a custodial statement "is determined solely by examining police conduct." Whether a statement is voluntary is to be determined using the factors enumerated in *Cipriano, supra*. Among other things, these factors include whether the accused was deprived of any essential needs, whether the accused was physically abused, and whether the accused was threatened with abuse. "No single factor is determinative." "The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made."

It is axiomatic that suppression of a defendant's statement is required upon established facts of improper police conduct on appeal. "A confession or waiver of constitutional rights must be made without intimidation, coercion, or deception . . . and must be the product of an essentially free and unconstrained choice by its maker." "The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." "The voluntariness of a waiver of this [Fifth Amendment] privilege has always depended on the absence of police overreaching."

At the *Walker* hearing, two police witnesses testified that after Alton was arrested and informed of his constitutional rights, he requested a cigarette break. Williams and Wilson testified that they therefore took Alton into a breezeway area between the Seventh Precinct building and garage. Williams testified that as Wilson and Alton smoked cigarettes in the breezeway, he told Alton that Idolthus had implicated him in the murders. Alton then "got a little angry." Nonetheless, Williams and Wilson both testified that after Alton was finished smoking, he went back inside to make a statement to Wilson. Wilson and Williams testified that they never hit, struck, choked, or punched Alton.

After returning inside from the cigarette break, Alton made a statement and signed it. Wilson testified that Alton never asked for a lawyer, never stated that he wanted to discontinue the interview, and never invoked his right to remain silent. At the bottom of the statement, Alton wrote in his own handwriting: "I would say that I'm sorry, I never wanted to hurt their family or them in any way, and if I could change this problem I would but I can't, and I'm sorry for that, I love my brother." Wilson testified that he at no time coerced Alton into confessing or giving the statement.

Alton testified differently at the *Walker* hearing. He claimed that after arriving at the Seventh Precinct, Wilson informed him that "a female" had "picked [him] out of the lineup "in which he had participated earlier that day. Alton testified that he freely signed the *Miranda* notification form, and that he did not mind talking to the police because he had "nothing to do with the murders." Alton claimed, however, that he told Wilson that he wanted a lawyer. According to Alton, Wilson nevertheless began questioning him and then took him into the breezeway area near the garage, where Officer Williams "was waiting." Alton testified that he never asked for a cigarette break and that he was not permitted to smoke while present in the breezeway. In the breezeway area, Williams told Alton that Idolthus had implicated him in the homicides. Alton admitted that he then became angry and began yelling at Williams. He testified that, while he was handcuffed, Williams then began to hit him, punched him in the chest, and choked him. However, Alton admitted that he never requested medical treatment and that he never made any type of complaint regarding Williams's alleged conduct.

Alton admitted that he signed and initialed the confession prepared by the police, and that he wrote out the answer to the final question in his own handwriting. However, he testified that he only did so because he had been physically abused and was afraid of further mistreatment. Alton testified that after Williams had hit, choked, and punched him, he decided to tell Wilson "whatever he wanted me to say."

In this instance, the *Walker* hearing essentially became a credibility contest between Alton and the police witnesses. We give special deference to the trial court's superior ability to assess the demeanor and credibility of the witnesses at a *Walker* hearing. Although Alton asserted that his confession was extracted through physically abusive police conduct, Wilson and Williams both testified to the contrary. Moreover, although Alton claimed that he was hit, punched, and choked, he admitted that he never sought medical attention following

> his interview and that he never complained of the alleged abuse to
> Williams's and Wilson's superiors. It was the duty of the trial court
> to listen to the witnesses and to assign weight to the testimony that it
> found most believable. Here, the court evidently determined that
> Alton's testimony lacked credibility, assigning greater weight to the
> testimony of Wilson and Williams than to the testimony of Alton. We
> perceive no clear error in this determination. The trial court did not
> clearly err in ruling that Alton's statement to the police was
> voluntarily given as a product of his own free will.

Michigan Court of Appeals' decision at 19-21, docket #33 (citations omitted).

The Sixth Circuit has established three factors to determine whether a confession was involuntary: the police activity was objectively coercive, the coercion in question was sufficient to overbear the defendant's will, and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).

In *McCall v. Dutton*, 863 F.2d 454 (6th Cir. 1988), the court concluded that statements that the defendant made to yelling police officers with handguns and shotguns drawn while the defendant was lying on the ground with multiple gun shot wounds, when defendant was under the influence of narcotics, were not the product of coercion. Similarly, statements made to an FBI agent without Miranda warnings, during a 90-minute interview inside the defendant's employer's office after the agent told defendant that his story was not believable and that giving false information would make the matter worse, were not the product of coercion. *Unites States v. Mahan*, 190 F.3d 416.

Petitioner claims that he was physically struck during his interview and that he only confessed to the murders because he feared further physical abuse. The trial court held a hearing on this issue and determined that the credibility of the police officers, who denied that any physical confrontation took place, outweighed Petitioner's credibility on this issue. Under these facts, the

Michigan Court of Appeals' decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner claims that the trial court erred by not completely severing his trial from his brother's trial. The Michigan Court of Appeals rejected this claim concluding that in accordance with Michigan law it was within the trial court's discretion to jointly try the brothers in the interest of judicial economy. Petitioner has not pointed to any constitutional right that was violated as a result of the joint trial. This claim, which is based upon state law procedures, is not an actionable federal habeas corpus claim. A federal court may not issue a writ of habeas corpus on the basis of a perceived error of state law. *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Engle v. Isaac*, 456 U.S. 107, 119 (1982); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988), *cert. denied* 488 U.S. 866 (1988). Therefore, it appears that this portion of Petitioner's argument should be dismissed. Moreover, Petitioner has failed to show that the Michigan Court of Appeals' decision on this issue was unreasonable.

Petitioner claims that his trial counsel was ineffective for failing to request an in-court line-up before the preliminary examination and for failing to have an expert witness on the identification issue testify at trial. To prevail on an ineffective assistance of counsel claim, a convicted defendant must demonstrate (1) that counsel's errors were so serious that counsel was not functioning as counsel guaranteed by the Sixth Amendment, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688-96 (1984). Stated another way, this court is to decide whether Petitioner's trial counsel's alleged failures were such egregious errors as to

constitute ineffectiveness and whether the alleged failures were materially prejudicial. The Sixth

Circuit has explained:

> The question for reviewing courts is whether counsel's errors have likely undermined the reliability of, and confidence in, the result. *Lockhart v. Fretwell*, 113 S.Ct. 838, 842-43 (1993). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment." *Strickland*, 466 U.S. at 691, *quoted in Smith v. Jago*, 888 F.2d 399, 404-05 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990). In evaluating petitioner's claim, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc), cert. denied*, 113 S. Ct. 2969 (1993). Thus, the determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was "snatched from the jaws of victory." *See id.*

*West v. Seabold*, 73 F.3d 81,84 (6th Cir. 1996).

> The Michigan Court of Appeals, in rejecting these claims, explained:

> Alton first contends that his trial counsel was ineffective for failing to retain an expert witness on the issue of eyewitness misidentification. He cites numerous scholarly treatises and articles for the proposition that misidentification by eyewitnesses is common, and often leads to wrongful convictions. We concede that misidentification does indeed occur, and have no doubt that it could lead to an unjust result in the absence of other, independent inculpatory evidence. However, here Davenport's identification testimony at trial was hardly the only evidence tending to implicate Alton in the homicides. Alton claims that apart from the testimony of Davenport, "there was absolutely no other direct, circumstantial, or even inferential evidence presented at trial to indicate [that Alton] was one of the perpetrators of the crimes charged." Conveniently, Alton disregards his own confession, which, as we have determined, was freely and voluntarily given to the police. In that confession, Alton admitted to personally killing both Edmonds and Olson. Moreover, Alton disregards the testimony of Idolthus, who testified before Alton's jury that Alton had committed the homicides. Finally, as we noted above, although Davenport failed to identify Alton at the

lineup, and only later identified him at the preliminary examination, Alton's jury was made fully aware of these facts. Thus, the jury was free to credit or discredit Davenport's identification testimony at trial according to its own best judgment. In light of the forgoing, we cannot conclude that Alton was actually prejudiced by counsel's failure to retain an expert on eyewitness misidentification. Even absent counsel's alleged error, the outcome of trial would not have been different. The record indicates no ineffective assistance of counsel in this regard.

Alton also contends that trial counsel was ineffective for failing to request an in-court lineup at or before the preliminary examination. Michigan law permits a preliminary-examination court to grant a defendant's motion for a lineup if the court chooses to do so in its discretion. Because granting a pretrial lineup is within the court's discretion, a defendant is not entitled to such a lineup as a matter of right.

The court would have been authorized to grant a lineup in its discretion at or before the preliminary examination. However, even if a lineup had been granted and Davenport had failed to identify Alton as one of the shooters, sufficient independent evidence of Alton's guilt–including Alton's own confession–still would have existed. In order to establish ineffective assistance of counsel, a defendant must demonstrate a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different. Because it is not clear from the record that counsel's actions in this respect were decisive to the outcome of the proceedings, we cannot conclude that counsel's failure to request an in-court lineup resulted in actual prejudice.

Michigan Court of Appeals' decision at 22-23, docket #33 (citations omitted).

In the opinion of the undersigned, the Michigan Court of Appeals' decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner asserts that the jury instructions on reasonable doubt improperly shifted the burden of proof to the defense. The court instructed the jury that:

> A reasonable doubt is a fair, honest doubt growing out the evidence or lack of evidence. It is not merely an imaginary or possible doubt, but a doubt based on reason and common sense. A reasonable doubt is jut that, a doubt that is reasonable after careful and considered examination of the facts and circumstances of the case.

Trial transcript Vol. XI at 87, docket #29. The Michigan Court of Appeals rejected this claim, explaining:

> Alton next argues in his supplemental brief that the trial court erred in giving the standard jury instruction on reasonable doubt. He asserts that the instruction is improper and shifts the burden of proof to the defense. We disagree. Not only did Alton fail to timely object to the court's reasonable-doubt instruction, his attorney expressed satisfaction with it. When a party expresses satisfaction with the jury instructions, that party waives review of any issue pertaining to those instructions.
>
> In any event, we note that the instructions were adequate as given in the instant matter. As long as the trial court instructs the jury that the prosecution must prove the defendant's guilt beyond a reasonable doubt, no particular form of words is required. We have previously held that CJI2d 3.2, the reasonable doubt instruction used by the trial court in this matter, presents an adequate and sufficient instruction concerning the concept of reasonable doubt. The standard jury instruction on reasonable doubt used by the trial court was not erroneous.

Michigan Court of Appeals' decision at 23, docket #33 (citations omitted).

The Supreme Court has held that "before a federal court may overturn a conviction resulting from a state trial, it must be established not merely that the instruction is undesirable, erroneous,. . .or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). That Court went on to say that the question is "whether the ailing instruction by itself so infected the

entire trial that the resulting conviction violates due process." *Id.* at 147.  Petitioner has not shown that any alleged defects in the instructions were so defective as to deprive him of his constitutional rights.

Moreover, the Supreme Court has held that, "the Constitution does not dictate that any particular form of words be used in advising the jury of the government's burden of proof, so long as taken as a whole the instructions correctly convey the concept of reasonable doubt." *Victor v. Nebraska*, 511 U.S. 1 (1993); *Holland v. United States*, 348 U.S. 121, 140 (1954).  It is clear that Petitioner is unable to establish that the jury instruction regarding reasonable doubt, given during his trial, violated the Constitution.  In *Cage v. Louisiana*, 498 U.S. 39 (1990), the court instructed the jury:

> This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture.  *It must be such doubt as would give rise to a grave uncertainty*, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof.  A reasonable doubt is not a mere possible doubt.  *It is an actual substantial doubt.* It is a doubt that a reasonable man can seriously entertain.  What is required is not an absolute or mathematical certainty, but a *moral certainty.*

498 U.S. at 40.  The court considered how a reasonable juror would have understood the instruction. The court found that the words "substantial" and "grave" suggested a higher degree of doubt than reasonable doubt and, coupled with the reference to "moral certainty" rather than evidentiary certainty, the instruction violated due process.  The Supreme Court made it clear that the analysis is not whether the instruction could have been applied in an unconstitutional manner but whether there exists a reasonable likelihood that the jury did apply the instruction in an unconstitutional manner.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (disapproving the standard of review language stated in *Cage*).

The Supreme Court has decided two cases upholding the constitutionality of the trial courts' reasonable doubt instructions. *Victor v. Nebraska* and *Sandoval v. California*, 511 U.S. 1 (1994). In these cases, the court distinguished the instructions given in each case from the instruction the court previously held was unconstitutional in *Cage*. In *Victor*, the court instructed the jury:

> "Reasonable doubt" is such a doubt as would cause a reasonable and prudent person, in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon. It is such a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abiding conviction, *to a moral certainty*, of the guilt of the accused. At the same time, absolute or mathematical certainty is not required. You may be convinced of the truth of a fact beyond a reasonable doubt and yet be fully aware that possibly you may be mistaken. You may find an accused guilty upon the <u>strong probabilities of the case</u>, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable. A reasonable doubt is an *actual and substantial doubt* arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the state, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture.

511 U.S. at 18. The court found that when reading the charge as a whole, the challenged phrases in *Victor*, unlike the words that were used in *Cage,* did not violate due process. The words "substantial doubt" were contrasted with "mere possibility," "bare imagination" or "fanciful conjecture" and mitigated by the hesitate to act test set forth in the instruction. The reference to "moral certainty" was alleviated by the instruction that the jurors must have an abiding conviction of defendant's guilt. Further, in consideration of the hesitate to act instruction and the instruction that guilt must be based on a "full, fair and impartial consideration of all the evidence" rather than speculation or conjecture, the court concluded that the inclusion of "moral certainty" as used was constitutional. Moreover,

the court determined that the use of the words "strong probabilities" was not error because the jury was told that the probabilities must be strong enough to prove guilt beyond a reasonable doubt.

In *Sandoval*, the court upheld the challenged jury instruction undertaking a similar analysis. The jury in that case was instructed:

> Reasonable doubt is defined as follows: It is *not a mere possible doubt*; because everything relating to human affairs, and *depending on moral evidence*, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, *to a moral certainty*, of the truth of the charge.

511 U.S. at 7. The court concluded that the use of the words "moral certainty" in the context of the entire instruction, where the court instructed the jury to consider all the evidence and described moral certainty as an abiding conviction, did not render the instruction constitutionally infirm. The court distinguished the use of moral certainty in *Sandoval* from its use in *Cage* where the jury was given nothing else to lend meaning to moral certainty. 511 U.S. at 16.

The court's instruction on reasonable doubt was a proper instruction. Petitioner cannot show that his constitutional rights were violated by the instruction. The Michigan Court of Appeals' decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Respondent argues that the remaining claims presented by Petitioner are procedurally defaulted. When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether

a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Petitioner has presented two claims that were reviewed by the Michigan Court of Appeals for plain error. Petitioner raised a claim that his due process rights were violated by the admission of an in-court identification which was suggestive (Claim II). The Michigan Court of Appeals stated:

Alton next argues in a supplemental brief filed *in propria persona* that Connie Davenport's identification of him at trial as one of the shooters was tainted by an unduly suggestive identification at the preliminary examination. Because Alton never challenged Davenport's identification through an appropriate motion or objection, this issue is unpreserved, and our review is limited to plain error affecting his substantial rights.

"An identification procedure that is unnecessarily suggestive and conducive to irreparable misidentification constitutes a denial of due process." To show a due-process violation, "'[the] defendant must show that the pretrial identification procedure was so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification.'"

We recognize that an in-court identification at the preliminary examination can be an impermissibly suggestive under certain circumstances. But because this issue was never properly raised below, the record does not provide a basis for concluding that the circumstances of the preliminary examination were unduly suggestive. Furthermore, even if an unduly suggestive identification procedure in fact took place, it is not apparent that the victim lacked an independent basis for her in-court identification. Davenport was present at 4139 Concord Street at the time of the shootings, and it is uncontested that she witnessed–at least in part–certain events that transpired in the house. We concede that certain aspects of Davenport's testimony were internally inconsistent and that Davenport testified that she did not personally know Alton at the time, referring to him only as "the brother of Gage." However, Davenport insisted at trial that from her vantage point in the living room, she had seen Alton exiting the kitchen immediately after the shootings with at least one firearm in his possession. Defendant has not shown that the victim's identification testimony at trial constituted plain error.

Moreover, although Connie Davenport did not identify Alton at the corporeal lineup that she witnessed on August 23, 2004, and only later identified him at the preliminary examination, Alton has not shown that his substantial rights were affected by Davenport's ultimate identification testimony. Alton's jury was made fully aware that Davenport had failed to identify Alton at the lineup and that she had only later identified him at the preliminary examination. The jury was free to use this knowledge in assessing the credibility of Davenport's identification testimony at trial. Moreover, even in the absence of Davenport's testimony, there was other evidence

implicating Alton as one of the shooters. Indeed, Alton indicated in his own statement to police that he had personally shot Edmonds and Olson. Consequently, Alton has failed to demonstrate that he is actually innocent, or that any error seriously affected the fairness, integrity, or public reputation of his trial. This unpreserved issue warrants no appellate relief.

Michigan Court of Appeals' decision at 21-22, docket #33 (citations omitted).

Petitioner raised a prosecutorial misconduct claim (Claim V). The Michigan Court of Appeals rejected the claim, explaining:

Alton lastly argues in his supplemental brief that the prosecution improperly bolstered the testimony of Sergeant Wilson by vouching for Wilson's credibility and by commenting on Alton's failure to ask Wilson whether he had been picked out of the lineup. Alton failed to preserve this issue by way of a timely objection at trial. We therefore review this unpreserved claim of prosecutorial misconduct for outcome-determinative plain error.

After an extensive review of the record, we find that the improper comments by the prosecution, if any, were minor and insignificant. Appellate review of unpreserved claims of prosecutorial misconduct is precluded if a curative instruction could have eliminated any possible prejudice to the defendant. Here, a curative instruction would have been sufficient to cure any prejudicial effect of the prosecutor's comments. Moreover, any possible prejudice was even further lessened by the trial court's instruction that the arguments of counsel do not constitute evidence, and by the trial court's instruction that the jury should disregard any argument that was not supported by evidence at trial. No plain error occurred in this regard.

Michigan Court of Appeals' decision at 23-24, docket #33 (citations omitted).

After expressly noting Petitioner's default in failing to object to both of these issues, the Michigan Court of Appeals then reviewed Petitioner's claims for plain error. On both issues the court found no plain error. In this circuit, "plain error review does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir.

1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice"); *Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-*4 (6th Cir. Nov. 2, 1994) (same, for "miscarriage of justice"). Accordingly, it is clear that Petitioner defaulted these issues and that there exists no basis to excuse his default. Moreover, Petitioner cannot show that the Michigan Court of Appeals' decision on these issues was unreasonable.

Petitioner never fully appealed his remaining claims (claims VII, VIII and IX) by raising them in his application for leave to appeal in the Michigan Supreme Court. Petitioner's application for leave to appeal these three issues to the Michigan Supreme Court was rejected as untimely (Docket #36). Accordingly, Petitioner has defaulted these claims and has only himself to blame. Petitioner cannot show cause or prejudice for his procedural default of these claims.

In summary, the undersigned concludes that Petitioner's claims are without merit and therefore recommends that this Court dismiss the petition with prejudice.

In addition, if Petitioner should choose to appeal this action, I recommend that a certificate of appealability be denied as to each issue raised by the Petitioner in this application for habeas corpus relief. Under 28 U.S.C. § 2253(c)(2), the court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court

in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, the undersigned has examined each of Petitioner's claims under the *Slack* standard.

Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." The undersigned concludes that reasonable jurists could not find that a dismissal of each of Petitioner's claims was debatable or wrong. Therefore, the undersigned recommends that the court deny Petitioner a certificate of appealability.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).


 /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:  January 30, 2013